UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD E. GORDON,<br><br>                     Plaintiff,<br><br>          -against-<br><br>SALO AIZENBERG and MAYTAL ASSET MANAGEMENT, LLC D/B/A DOWNTOWN INVESTMENT ADVISORY,<br><br>                     Defendants. | Case No. _____<br><br>**<u>COMPLAINT</u>**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Richard E. Gordon ("Plaintiff" or "Gordon"), by and through his undersigned counsel, as and for his Complaint against Defendants Salo Aizenberg ("Aizenberg") and Maytal Asset Management, LLC d/b/a Downtown Investment Advisory ("DIA") (collectively, "Defendants"), states and alleges, as follows:

## <u>SUMMARY OF THE CASE</u>

1.      This action arises out of Defendants' improper and wrongful acts, omissions and misconduct relating to a discretionary investment advisory account opened and maintained by Gordon with Defendants, who hold themselves out as expert investment advisors. Aizenberg initially fraudulently induced Gordon to open an investment advisory account with Defendants in August 2018.  Thereafter, Defendants managed Gordon's advisory account in a fraudulent and unsuitable manner, and in breach of their fiduciary and other duties, resulting in staggering losses to Gordon.  Aizenberg, who professes devotion to his faith and religious institution, would try to sweep his wrongdoing under the rug by proposing an illegal payment to Gordon, which Gordon rejected.

## PARTIES

2.      Plaintiff Richard E. Gordon ("Plaintiff" or "Gordon") is a U.S. citizen, resident and citizen of South Dakota and resident of Los Cabos, Mexico. Gordon is an ordained Pastor and author, and is affectionately known as "Pastor Rick." Gordon has been a co-Pastor of a small church located in an economically distressed portion of Los Cabos, Mexico that also serves as a community center for its impoverished congregation (many of whom live on dirt floors and are without plumbing and electricity).  Gordon lives modestly, but was fortunate enough to inherit a significant sum of money from relatives.

3.      Gordon has limited experience investing in stocks. Prior to his dealings with Defendants, he had no investment experience with bonds, preferred stocks and other financial instruments utilized by Defendants and he had never utilized margin. Gordon had only a limited understanding of the high-risk, heavily-margined investment strategy implemented by Defendants, and the risks and consequences of such a strategy.  In fact, the true nature of the significant risks associated with Defendants' investment strategy was not disclosed, and concealed, by Defendants who repeatedly told Gordon that their investment strategy was conservative and consistent with Gordon's conservative, low-risk investment objective and goal.

4.      Upon information and belief, Defendant Salo Aizenberg ("Aizenberg") is an individual residing at 31 Bloomingdale Drive, Scarsdale, New York 10583 and a citizen of the State of New York.

5.      Aizenberg holds himself out as the owner and manager of Downtown Investment Advisory and an "expert" investment advisor. Thus, the website for Downtown Investment Advisory states that "Salo Aizenberg is the owner and manager of Downtown Investment Advisory. Mr. Aizenberg is an expert investment professional with 20 years of institutional fixed-

income investing experience prior to founding Downtown Investment Advisory in 2013." Aizenberg further touts his experience and background as including "10 years at BNP Paribas, one of the largest global banks, managing fixed income portfolios exceeding $500 million, 10 years as a Managing Director investing various institutional fixed income funds exceeding $200 million, and Director and investment advisor for a multi-million dollar charitable foundation." The website also states that Aizenberg obtained an "MBA in Finance from Columbia University Business School."

6. Upon information and belief, Defendant Maytal Asset Management, LLC is the entity that does business as Downtown Investment Advisory (collectively and together as "DIA"). Upon information and belief, DIA is a New York limited liability company, with its principal place of business located at 360 Hamilton Avenue, Suite 1110, White Plains, New York 10601. Upon information and belief, Aizenberg, a New York resident and citizen, is the sole owner of DIA and, as such, DIA is deemed to be a citizen of New York for diversity jurisdiction purposes.

7. Upon information and belief, DIA is a registered investment advisor (CRD#168812/IARD#801-110387), registered with the United States Securities and Exchange Commission ("SEC") as such since 2017. According to its website, DIA has "$125 million in assets under management for high net worth families and charitable foundations" and touts itself as an investment advisory firm that "provides investment management services focused on fixed income." Upon information and belief, DIA reportedly has two employees, one of which is Aizenberg, who is believed to be the only "expert investment professional" at DIA.

8. DIA acknowledges on its website, as it must, that it **"has a fiduciary obligation to put the client's interest first"** and that **"DIA has fiduciary obligations to all of its clients that**

**many investment professionals, such as advisors at the large brokerage firms, are not required to provide."**

9.        DIA is liable for the acts, conduct and omissions of Aizenberg under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of Aizenberg's employment and agency.

## JURISDICTION AND VENUE

10.        This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because this Court has exclusive jurisdiction of any alleged violation of the Securities Exchange Act of 1934.

11.        This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332 based upon diversity of citizenship since this action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

12.        Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 15 U.S.C. § 78aa because both Defendants are citizens and residents of the State of New York and reside and transact business in this District.

13.        In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail and interstate telephone and electronic communications.

## BACKGROUND

14.        Gordon is married to Paloma Gordon, a citizen of Mexico. They have a son who is 9 years of age.  Gordon obtained a liberal arts degree from the Hutchins School of Liberal Studies at Sonoma State University. He also studied abroad at Oxford University through the Washington

International Study Center.  After graduating college and working for a Fortune 500 company in its restaurant and strategic service departments, Gordon pursued his entrepreneurial dreams and spent the next 13 years as the creative and marketing co-founder of three companies centered around education and child safety.

15.     Gordon moved to Los Cabos, Mexico in 2002 fulfilling his dream to live in a small beach town.  He would later enroll in a seminary and be ordained as a Pastor.

16.     Gordon has been the co-Pastor of "Puerta del Cielo" church, spending his time dedicated to leading bible studies, mentoring, marriage counselling, preparing sermons and working on numerous community outreach programs. Gordon recently started a mobile food program during the current pandemic that is feeding 300 children a day five times a week from the back of his car in some of the poorest of colonies in Los Cabos.

17.     In or about August 2018, Gordon inherited approximately $650,000 from his uncle on his father's side. Gordon's father and grandfather had conveyed to Gordon throughout his life that he had a great responsibility to protect and cautiously guard any inherited money for his children and grandchildren. (As described below, Gordon would later inherit an additional $1.2 million from his aunt on his mother's side in July 2019.).

18.      Gordon and his family live a frugal and modest lifestyle in Los Cabos in Baja Sur, Mexico.  Gordon does not take a salary as a Pastor and he gives his books away for free.  He did not intend to use the inherited funds in a lavish manner.

19.     Gordon set out to find someone who could assist him in conservatively investing the funds in a manner that protected and preserved the principal for his son and for generations to follow.  Gordon would use whatever interest or gain to enhance his family's lifestyle to the extent possible.

20.     In or about August 2018, Gordon stumbled upon an online financial article written by Aizenberg as he explored how to handle his inheritance. The article impressed Gordon.

21.     Gordon initially emailed Aizenberg, and then spoke with Aizenberg on the telephone.  Aizenberg identified himself as a family man, devoted to his faith and very active in his temple. Gordon was impressed by Aizenberg's professed deep faith and seemingly good character.

22.     Gordon expressed to Aizenberg that his goal was to conservatively protect and preserve the principal of the inherited funds and to live off any interest or gains.  Gordon further told Aizenberg that he wanted to be able to sustain his humble and modest lifestyle of serving others, giving his books away for free and providing his wife the opportunity to leave her job and join him in full-time ministry.  Indeed, throughout the relationship, Gordon would send Aizenberg pictures of his community efforts, scriptures from the old testament and new books.

23.     In order to induce Gordon to open an advisory account with Defendants, Aizenberg represented that Defendants' investment strategy was extremely safe, a third less volatile than the equities market, that Defendants avoided the riskier market sectors (like oil and gas), and that Aizenberg was a "superior risk manager" with many years of experience and expertise (as described on DIA's website). Aizenberg further represented and emphasized to Gordon that Defendants' investment strategy was substantially less risky than investing in equities and that Defendants would manage the risk in such a manner that it would comply with Gordon's conservative investment objective and goal.

24.     In addition, Aizenberg represented to Gordon that Defendants utilized the same investment strategy for very conservative, non-profit entities and retirees.

25.     Aizenberg also touted his vast experience, extensive background and investment expertise (similar to the description on DIA's website) to Gordon in order to make Gordon feel comfortable that Defendants would manage Gordon's investment funds consistent with his conservative objective and desire.

26.     Aizenberg was well aware that Gordon's understanding and appreciation of Defendants' proposed investment strategy was only limited.

27.     Gordon reasonably relied on Aizenberg's representations.

28.     On or about August 31, 2018, Aizenberg presented Gordon with an Investment Advisory Contract via email.  Aizenberg stated that this was required by law.  Gordon reviewed the Investment Advisory Contract and noted to Aizenberg that the Investment Advisory Contract appeared to suggest that Defendants would be employing a strategy that utilized more risk than Gordon was comfortable with and which they had previously discussed.  Aizenberg was emphatic that such was not the case and reiterated that Defendants' strategy was substantially less risky than investing in equities and that Defendants would "manage the risk" in such a manner that it would comply with Gordon's conservative investment objective. Aizenberg further represented to Gordon that the way Defendants utilized margin had little risk due to the nature of bonds.

29.     Aizenberg further convinced Gordon that the Investment Advisory Contract was just a standard agreement that he was required to use with all of his clients and that he should not concern himself with the boilerplate language.

30.     Aizenberg was very convincing and persuaded Gordon that he had Gordon's best interests in mind and would put protection of his assets above all else, while continuing to identify himself as a devoted family man, a person of deep faith and very active member of his temple.

31.     The Investment Advisory Contract granted Defendants with discretionary authority over Gordon's advisory account at DIA (the "Advisory Account") and sets forth a fee of 1.00% per annum of the assets under management for Defendants' "expert" investment advisory services. In furtherance of Aizenberg's representations to Gordon, the Form ADV Part 2A for DIA that Defendants provided to Gordon states that "DIA offers customized investment advisory services to individuals" and it goes on to say that "DIA begins by listening closely to client needs and concerns with the end goal to develop an investment plan to aid in the selection of a specific portfolio of investments that matches each client's needs and request."

32.     Gordon reasonably relied on Aizenberg's representations and signed the Investment Advisory Contract.

33.     Aizenberg's representations to Gordon were materially false and misleading. Aizenberg well knew that the investment strategy Defendants intended on employing for Gordon was not a conservative investment strategy and was patently unsuitable for Gordon.  Contrary to Aizenberg's representations to Gordon, Defendants' investment strategy presented extreme risks, including a portfolio of investments that were predominantly structured to provide high current yield and the utilization of high margin ratios.

34.     Aizenberg further instructed Gordon to open a brokerage account at Interactive Brokers and directed him on how Aizenberg needed the account set up in order for Defendants to deploy their investment strategy and what should be stated on the application.  In addition, Aizenberg directed Gordon to set forth, among other things, that he had experience with bonds, although Gordon had no such experience. Aizenberg told Gordon not to concern himself with the application, as certain things needed to be stated for Aizenberg to be able to manage Gordon's money.

35.     In reliance on Aizenberg's representations, Gordon opened the Advisory Account by depositing with Defendants the $650,000 that his uncle had passed to him.

36.     Contrary to Aizenberg's representations, Defendants immediately began investing Gordon in a high-risk, margin-based strategy.  Thus, the account statement for September 2018 shows a "long" position in stocks and bonds of $953,190.73, a "short" position of -$302,858.62 and that the ending value was $650,332.12.  The "short" position is actually the amount of the margin debt, which was approximately 46% of the account value.

37.     By the end of December 2018, the "short" position (or margin debt) had ballooned to -$608,549.94 (over 100% of account value) and had an account ending value of $594,371.62. Yet again, Gordon did not appreciate that Defendants had actually placed Gordon in a high-risk strategy that posed a significant threat of loss of the principal amount he invested with Defendants.

38.     In or about June 2019, Gordon's aunt who passed away left Gordon $1.2 million with the same mandate - - to cautiously protect the funds for his son and family legacy.

39.     Upon contacting Aizenberg about the inheritance, Aizenberg represented that he could consolidate these funds with the other funds Gordon had entrusted to Defendants, and that the funds would be managed in the same conservative manner.

40.     Shortly thereafter, and prior to transferring the newly inherited $1.2 million to Defendants, Gordon set up a conference call with Aizenberg.  Gordon included his wife on the call so that in the event that something should happen to Gordon his wife would be familiar with Aizenberg.  Once again, Aizenberg reiterated during the conference call that Defendants' strategy was safe, a third less volatile than the equity markets, that no investments would be made in high-risk sectors, that Aizenberg was an "expert risk manager" and that Defendants would properly manage the Advisory Account in a conservative manner that protected and preserved the principal.

41.     In or about June 2019, Gordon, based upon his trust and confidence in Aizenberg and Aizenberg's representations, entrusted and deposited the additional $1.2 million with Defendants.

42.     Contrary to Aizenberg's representations, Defendants continued investing Gordon in a high-risk, heavily-margined investment strategy, which was completely inconsistent with Gordon's objective of low risk and preservation of principal.  Thus, by the end of August 2019, the Advisory Account had a "long" position of $3,113,142.36, a "short" position (or margin debt) of -$1,203,153.64 and an ending value of $1,909,988.72.

43.     On January 7, 2020, Aizenberg sent Gordon and his wife Paloma an email providing an annual account performance review. In the email, Aizenberg states that "Since inception the account has generated $162,000 in investment gains, at an 11.2% annualized return. Looking at net cash interest only, over the past six months (since the $1.2 million deposit), total net interest was about $77,000 or $154,000 annualized, about an 8% net yield (after margin cost and fees). This income level easily covers your proposed withdrawals of $64,000 – taking out amounts less than the income generated will allow the account to grow, increase the income stream over time, and allow the account to support your family for decades."

44.     Notably, Aizenberg expressly recognized in the email that Gordon was not interested in outsized gains, but just enough to assist with his modest lifestyle.  Also, Aizenberg expressly recognized Gordon's goal to preserve and protect the principal for "your family for decades."

45.     Moreover, both bond and stock markets posted strong performances in 2019 without the significant margin risks associated with Defendants' investment strategy utilized for

the Advisory Account. The Dow Jones rose 22.3% in 2019, corporate bonds returned 14.54%, high yield bonds gained 14.32%, municipal bonds returned 7.54% and even treasuries gained 6.86%.

46.     Aizenberg also failed to disclose, and makes no mention, in his January 7, 2020 email that the growing margin debt in the Advisory Account had perilously reached $1,866,090.25 by the end of December 2019, close to 100% of the account value.

47.     In addition, the portfolio of stocks and bonds in the Advisory Account, by itself, and without considering the indefensible margin debt, did not comport with Gordon's conservative investment objective and desire to preserve and protect the principal. Thus, the investments were predominantly structured to provide high current yield and at times the issuers were themselves leveraged. For instance, AGNC Investment Corp. ("AGNC"), purchased by Defendants for the Advisory Account, is a Real Estate Investment Trust that purports to invest in mortgages on a leveraged basis. Thus, AGNC states on its website that "We invest predominately in agency residential mortgage-backed securities on a leveraged basis, financed primarily through collateralized borrowings structured as repurchase agreements."

48.     Crescent Capital BDC, Inc., also purchased by Defendants for the Advisory Account, purports to "invest in debt securities at all levels of a company's capital structure. For over 25 years, we have been investing in senior bank loans, high yield bonds, mezzanine debt and distressed debt securities" and also use leverage in their investments.

49.     Eagle Point Credit Company, purchased by Defendants for the Advisory Account, purports to be "a publicly traded closed-end investment company" with "Our primary investment objective is to generate high current income, with a secondary objective to generate capital appreciation. We seek to achieve our investment objectives by investing primarily in equity and junior debt tranches of CLOs."

11

50.     Gordon was satisfied with Defendants' performance at this point because he was not looking for outsized gains - - his goal was to protect the principal and believed and trusted that Aizenberg had been keeping his word and managing the Advisory Account consistent with Gordon's conservative objective. Aizenberg had not kept his word though and, unbeknownst to Gordon, had placed Gordon in investments that were inconsistent with his conservative objective and amassed a massive margin debt that was likewise inconsistent with Gordon's conservative objective.

51.     In February 2020, with the looming danger of COVID-19 becoming ever more apparent to Gordon, Gordon determined to liquidate his investment holdings to cash.

52.     On February 24, 2020, Gordon contacted the financial advisor at Wells Fargo Advisors to liquidate an account which was left to his son from his aunt upon her passing.  The financial advisor at Wells Fargo Advisors understood Gordon's concerns about COVID-19 and promptly followed Gordon's instructions to sell the investments.

53.     On or about February 26, 2020, Gordon contacted Aizenberg by telephone to instruct Aizenberg to likewise liquidate the Advisory Account into cash. Gordon expected a quick and respectful call like he experienced with the financial advisor at Wells Fargo Advisors. During the call, Gordon told Aizenberg that he already had his son's investments sold at Wells Fargo Advisors.  Gordon further explained his coronavirus concerns and fears to Aizenberg and directed him to liquidate his Advisory Account.  Aizenberg responded that liquidating would be a mistake and "dumb," and he refused to accept and comply with Gordon's instructions.

54.     Aizenberg insisted that Gordon stay the course and that Aizenberg was well equipped to continue to protect and preserve Gordon's investment funds. Aizenberg further belittled the pandemic as overhyped and ridiculed Gordon.  Aizenberg told Gordon that it would

cost him 4% if he went to cash and then back into the market, that his Advisory Account was like an "ATM machine" and mocked Gordon for wanting to turn off the "ATM machine."  Aizenberg reiterated to Gordon that he was an experienced and expert investment adviser and risk manager, that these issues were beyond Gordon's appreciation and that Aizenberg would capably protect and preserve Gordon's funds as he had been doing.  Gordon, who did not appreciate the risks and consequences of Defendants' investment strategy, would reluctantly relent believing that Aizenberg knew better than Gordon as to how to deal with the situation and that Aizenberg had Gordon's best interests at heart.

55.     On or about February 26, 2020, the margin debt for the Advisory Account exceeded 100% of the ending account value for that day and was over $2 million dollars at that time.  Defendants should never have put Gordon at such significant risk of loss.

56.     On February 27, 2020, Aizenberg sent an email to his clients, including Gordon, concerning "Coronavirus & Market Declines."  Aizenberg states in the email that "coronavirus fears are overblown," "this does not seem to be the type of event that will have a lasting effect on our economy," the "portfolios generally contain nearly all U.S. focused bond issuers, and by design excludes highly cyclical businesses, oil & gas producers, and travel related businesses, so I would expect the issuers to be able to withstand a quarter or two of a recession," and he encouraged "'staying the course' and not making panic moves."

57.     Aizenberg sent Gordon a follow-up email, but now Aizenberg suggested that his bond holdings were riskier than Aizenberg had previously represented to be the case.  Thus, Aizenberg stated that "Again, there is a correlation, and I would certainly say the bond portfolio carries far less risk than stock, but it's not quite predictable. There certainly may be more volatility and price weakness . . ."  At the same time, Aizenberg stated that Gordon's "portfolio is well

diversified" and that Gordon should not be unnerved. Yet, by the end of February 2020, the margin debt in the Advisory Account had reached $2,017,945.63, over 100%, continuing to present a significant risk of loss to Gordon. Defendants should never have put Gordon at such significant risk of loss.

58.    Gordon was fearful that Aizenberg would stop responding to his communications and ignore the Advisory Account, so he emailed Aizenberg encouraging messages in the hopes that Aizenberg would watch out for his family's best interests. However, Defendants continued to utilize a high-risk strategy, using extensive margin during one of the most turbulent markets in U.S. history, which was clearly contrary to Gordon's conservative investment objective and goal and the financial well-being of his client that Defendants were duty-bound to protect.

59.    During the course of the weeks to follow, Gordon communicated with Aizenberg every day, and sometimes multiple times a day, sharing his concerns and worry about his Advisory Account and his family's well-being. Gordon would plead with Aizenberg not to lose all of his family's money, as he would never be able to replace it. Aizenberg became increasingly irritated with Gordon, which only heightened Gordon's concerns and fears. Still, the margin debt was at approximately 100% of Gordon's account equity.

60.    Unfortunately, Gordon's concerns and fears were well founded and the market crashed over 40% in just 32 days. Gordon's account value would plummet.

61.    On March 17, 2020, the Advisory Account had a "Negative Liquidation Value" of $1,280,456.36, $366,186.82 in "Available Funds" and a "Margin Ratio" of 71.40%.

62.    Gordon was in a panic and trying to learn as much as he could, and he sent an email to Aizenberg as follows:

Good Morning,

I hope my calls and emails are not annoying you. Yet, I can understand if they are. I'm not proud of my anxiousness and apologize if any offense has been taken.  Even as a pastor , I'm growing everyday. I'm a work in progress on all fronts of my life.

What people don't know about me apart from being a long haired surfer dude and pastor is that I  went to college at Oxford on scholarship and spent years at a fortune five hundred company and different start ups prior  to going into ministry. So, I'm naturally inquisitive and on the search for knowledge and understanding. part of the reason , I went to seminary was that I missed school and learning.  Today, I still spend 2-3 hrs studying and writing as I get great joy from it.

Enough with the rambling: I have a question.

**I was wondering why most Junk Bond Funds  ( HYG , JNK,)  are down only 13% for the year while ours is down much more ?**

One of our  great motivations of a income fund strategy was how you communicated that bonds usually trade down a third of equities such as the above junk bonds are.

Should , I  have a number perhaps ( sub 1 mm) to sell everything  to protect my family. As, we will never be able to replace this money as we're both in ministry and do everything for the love of helping people. We don't take a salary and  give our books away for free, even though we get calls from publishers once a month.

Thanks again

Rick and Paloma

63.     It is readily apparent from Gordon's email that he is walking on eggshells with Aizenberg.  Gordon had previously requested that Aizenberg liquidate his Advisory Account based upon his concerns and fears, but he was rebuffed by Aizenberg.  As Gordon's fears and concerns had at that point become a reality, he was desperately trying to liquidate his investment funds, but Aizenberg continued to ignore Gordon's requests.

64.     Aizenberg responded to Gordon, stating:

The exchange traded bonds are trading with very thin liquidity and pricing action is not really moving with the broader market. The market action on these is going its own way.

It is not moving with the fundamentals of the underlying companies.

Good example: I bought an issue of HMLP-A paying at 8.75%, one of the issues I rotated you into. The stock today was up 10% (HMLP). Yet the preferred fixed income issue was down 11% -- this makes no fundamental sense and is really a reflection of a quirky market right now. Some bonds fell today 8-9% on just a few thousands units traded.

Your margin continues to be managed, there is still plenty of cushion. I would hate to lock in losses that I believe will reverse. Your portfolio is quite diversified with some 70 positions. They are not all going bankrupt, let alone any!

I don't know when things may change will continue to monitor very closely.

65.    During this period of time, Aizenberg would again expressly recognize that he knew he was dealing with a person - - Gordon - - who had lacked the appreciation of the significant risks associated with Defendants' investment strategy.  Aizenberg cavalierly told Gordon to "Stop looking at [his] account, just go surfing."

66.    On March 19, 2020, Aizenberg sent an email to Gordon in which he states that he does "intend to diversify some more, as you do have some concentrated positions," directly contradicting his numerous representations that the Advisory Account was well diversified, a representation that was clearly untrue.  Aizenberg also suddenly expressed his concern about the margin risk, which directly contradicted his representations about being an expert in managing risk and statements of a few days prior that the margin was supposedly being "managed."   Gordon called Aizenberg after receiving the email and told Aizenberg that if he had simply followed Gordon's instructions to liquidate, the situation he now put Gordon in would have never happened and that Aizenberg had not even reduced the level of risk.

67.     In a March 26, 2020 email to Gordon, Aizenberg again states he was further diversifying the portfolio and included "some much higher quality bonds." Of course, and as Aizenberg was well aware, Gordon never had any interest in or appetite for the level of risk Defendants had engaged in.

68.     Thereafter, Aizenberg admitted responsibility for the egregious and wrongful manner in which he managed Gordon's Advisory Account.  Aizenberg offered to pay off  Gordon with $20,000 from a charitable non-profit corporation that Aizenberg's father had left him to manage upon his passing. Aizenberg asked Gordon if he had a non-profit corporation to transfer the money to as Aizenberg's charitable trusts could only deposit money into another non-profit corporation.  Gordon told Aizenberg that his books are for free and that he did not take a salary for being a pastor.  Aizenberg responded that Gordon could use the money for personal expenses. Gordon believed that what Aizenberg had proposed was illegal, and he flatly declined the offer notwithstanding the fact that Aizenberg's misconduct had caused Gordon substantial losses.

69.     Gordon would continue his efforts to have Aizenberg liquidate his Advisory Account, but each time Aizenberg refused to do so.  From Gordon's perspective, Aizenberg had done nothing less than seize his funds and simply would not let go, resulting in catastrophic losses to Gordon.

70.     Gordon again pleaded with Aizenberg via email, dated March 30, 2020, stating:

> First and foremost, I hope your family is safe and in good spirits. I want to thank you for wanting to help  manage my account after March 18th.  As, I know you have a 1mm requirement.  As well as  offering me 20 [thousand dollars] from your non profit and your willingness to not charge me a advisory fee.
>
> This coming Tuesday at 10am on Match 31, 2020. I'm setting up a temporary food kitchen out of the back of my car  to feed the poor and now unemployed in a very underserved barrio five days a week .The Mexican government has asked everyone to stay home , requested all non essential businesses closed but sadly  is  not  offering  any  financial  assistance  to  the  poor.   I'm

talking about people who have dirt floors, tin roofs and outdoor plumping. The woman from  my own church who operate our church  kitchen that  feed kids during the week  are  too scared to open it anymore.  I realize that my actions come with  some dangers,  as Mexico  does not have the  testing capability of the US nor the resources to care for patients. But,  I need to help. It's not in me to sit on the sidelines and see kids go to bed hungry.

**Thus, I'm writing to you tonight requesting that all my positions be sold on monday March 30, 2020 and that my account goes to all cash by the end of the day.**  As, I need to try to protect my family financially, Especially if something happens to me . Please try your very best to sell my positions in a very methodical best price possible basis versus a mass dumping. I need to try to salvage as much money as possible from what's left of it.  Once my account is in cash, I will then process the papers with interactive brokers to disconnect from your advisory business. I really appreciate your assistance as I don't know anything about bonds or how to sell them.  I really need your help to get to cash. Please help me.

I'm writing versus calling you . As, last time. I called you and said I wanted to be out of the market and on sidelines on February 26th.  You talked me out  of it. By telling me that the coronavirus was overhyped and that the flu was more dangerous and  that it would cost me 4% to get out of the market and big in later. In addition, to saying that if I got now.  I would be missing all the income generated from the portfolio as its like  ATM machine. Thus, I now believe it's better to write to you in requesting my account be put in cash. As, I'm just not emotionally up to speaking with you. I hope you understand.

Perhaps,  It's a big mistake to sell. Yet, if my  desire to sell was respected  way back in February as I wanted. I would have  protected my family financially and would have been more present and available to serve my community and not swallowed up in depression, fear and anxiety.  I do apologize for unloading my feeling of depression on you via calls and emails on and after March 18th.  I just didn't have anyone to talk too.

Yes,  It could be making a big mistake selling and super stupid in your opinion. I just I don't have your background or expertise to understand the markets. It's why ,I put my family's financial  future in your hands in a strategy that you considered safe.  I knew your strategy wasn't going to turn my 1.8mm into 3 or even 4mm. Which was fine , I only wanted a  income from dividends that allowed me and my wife to serve in ministry  full time without needing compensation ,give my books away for free , help my church  and  to preserve the principle  so one day  my son could inherit it. Salo,  We come from different worlds.  Heck,  I was a liberal arts student at a state college and studied poetry abroad. I tried to make myself sound smarter on March 17th as I was hurt and offended when you told me " stop looking at your account ,  just go surfing " I felt so disrespected and talked down too that day. I was naturally nervous and just wanting to protect my

family. rightfully so, 24 hrs later , I lost 1.3mm that I only inherited 8 months prior. Gone ! no way to ever replace it.  I don't understand why you  kept my portfolio  at 50% margin with all your experience in some of the most volatile markets in US history. Considering after my account imploded you were  all about reducing risks and using very little margin. I needed that Salo weeks ago.  Meanwhile during  some of most stressful days of my life you wanted me to just go surfing and not look at my account while I was fully margined in a middle of a pandemic with a market that had sell offs worse than the great  depression , 1987, 2008.

Sorry about the venting.  Please don't write me back Salo. You've already said  you  felt  terrible  and  apologized.  Which,  I  do  sincerely appreciate.  There's  nothing left to be said or discussed between us.

I now just need you to just sell my positions on Monday and get me to cash. So, I can start focusing on helping as many kids as possible.

I will be praying in earnest that your family remains safe and in good spirits.

Stay brave. We will get through this !

Pastor Rick Gordon.

71.    Aizenberg's response was simply "OK will work as best as possible to move to cash," and he made no effort to refute any of Gordon's assertions.

72.    Yet, even after Gordon again instructed Aizenberg to sell everything, Aizenberg continued to refuse.  Thus, on April 2, 2020, Aizenberg states in an email to Gordon:

I know you are desperate to sell out of these bonds. Unless you want to lose maybe half the value of these bonds, I urge you to exercise the patience that I have recommended numerous times to you. As I have said a several times, these bonds are very illiquid and the best thing to do is wait for a market to appear. If held over time I believe there is decent chance a market will appear again, and if held to maturity, they will most likely pay back in full. There is not much else we can do now. I will check every day. There is nothing else to do every day but check. I'll do so tomorrow and every day after.
You hold bonds in
Targa Resources Corp (Ticker: TRGP), the bonds are under Atlas Pipeline (APL) since that was the original bond issuer but they were bought by Targa. Targa is a $1.6 billion market cap natural gas pipeline company which is expected to manage just fine through this period. The bonds traded at 97-99 for a long time but yesterday one person it seems sold literally one $10,000 piece for 49.361 which was the new so-called "market price" for the bond, half the previous price, which is why you see a "paper" decline in your bond

price. Someone probably put in a low ball bid and someone took the bid price.
I believe the seller gave away a good bond for half price.

FS Energy is a mult-billion investment company that invests in energy and
power companies. The sector is not doing well but this multi-billion fund
should      be      fine.     Their     website     is      here:
https://www.fsinvestments.com/investments/funds/fsep

These bonds are traded very infrequently and have no bids most of the time.
Alecentra is now part of Crescent Capital, a $1 billion BDC with 2.5x asset
coverage of debt. I believe the bonds will be fine. You can look up ticker
CCAP.  This is a very small bond issue that does not trade often.

73.     Aizenberg had defrauded Gordon.

74.     At base, Aizenberg's representations to Gordon that Defendants would expertly

manage Gordon's Advisory Account in a conservative manner that would preserve and protect the

principal were utterly false.  By Aizenberg's own written admissions, Defendants failed to properly

diversify the account, overconcentrated in illiquid investments, purchased lower quality, risker

bonds and further substantially heightened the risks by utilizing extreme margin.

75.     In addition, there is further evidence to question Aizenberg's *bona fides*.  According

to the SEC's Investment Adviser Public Disclosure ("IARD") website, Aizenberg is not registered

as an Investment Advisor Representative.  Nor does his name appear when it is searched for in the

Financial Industry Regulatory Authority ("FINRA") BrokerCheck.  Notwithstanding, in DIA's

Form ADV Part 2B, Aizenberg is listed an "Investment Adviser Representative" and strangely

contains a "Personal CRD Number" (*i.e.*, a unique number that is assigned to every registered

representative licensed to sell securities) even though such personal CRD Number does not appear

to exist in the SEC and FINRA's databases.  Further, there is no evidence to suggest that Aizenberg

maintains any securities or advisory licenses of any kind or that he has taken, passed or holds any

securities or advisory licenses.  Also, neither Aizenberg nor DIA were registered in the State of

California until late March 2020 and they have never been registered in the State of South Dakota.

76.     As a direct and proximate result of Defendants' acts, misconduct and omissions, Defendants caused in excess of $1 million in losses in Gordon's Advisory Account.  Defendants' wrongdoing was intentional, egregious, malicious, evincing a high degree of moral turpitude and demonstrating wanton and willful dishonesty, such that punitive damages should be awarded to Plaintiff.

## FIRST CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY against ALL DEFENDANTS)

77.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

78.     Defendants, as investment advisers with discretionary authority, owed Plaintiff a fiduciary duty and at all times were required to act as fiduciaries.  Defendants controlled Plaintiff's Advisory Account and made all decisions relating to the transactions effectuated in Plaintiff's Advisory Account.

79.     Gordon entrusted, among other things, his decision making to Defendants, and reasonably relied on them to manage his affairs in the utmost good faith, with the utmost and highest degree of care, prudence and undivided and undiluted loyalty and with due regard for Plaintiff's conservative investment objective and risk tolerance, client profile and desire to safeguard and preserve his investment funds and for Defendants to refrain from exposing Plaintiff to unwanted, unwelcome and unnecessary risk.

80.     Defendants were required to invest Plaintiff's funds and manage the Advisory Account in a manner that was consistent with Plaintiff's conservative investment objective and risk tolerance and client profile and to refrain from exposing Plaintiff to an unwanted, unwelcome and unnecessary level of risk.

81.     Defendants were further required at all times to continually review and monitor the Advisory Account to insure that such account was being managed consistent with Plaintiff's

conservative investment objective and risk tolerance and to refrain from exposing Plaintiff to an unwanted, unwelcome and unnecessary level of risk.

82.     In addition, Defendants were required to be candid and honest with Plaintiff concerning the handling and management of the Advisory Account, including an affirmative obligation of utmost good faith and full and fair disclosure of all of the facts material to Plaintiff's engagement of Defendants and a duty to avoid misleading Plaintiff.

83.     Defendants breached their fiduciary duties to Plaintiff by (i) investing Plaintiff's investment funds in an improper, unsuitable, speculative and high-risk manner, (ii) overconcentrating the investments in the Advisory Accounts in illiquid and/or lower quality bonds, (iii) failing to properly diversify the investments in the Advisory Account, (iv) failing to handle and manage the Advisory Account consistent with Plaintiff's conservative investment objective and risk tolerance, (v) utilizing excessive margin in the Advisory Account throughout, (vi) failing to properly monitor the Advisory Account to insure that such account was being properly managed consistent with Plaintiff's conservative investment objective and risk tolerance, (vii) misrepresenting to Plaintiff the true nature of the risks involved in the manner in which Defendants were managing the Advisory Account, and (viii) failing to liquidate the Advisory Account to cash upon Plaintiff's request to do so.

84.     As a direct and proximate result of Defendants' misconduct and breaches, Plaintiff has incurred damages exceeding $1 million and in an amount to be demonstrated at trial.

**SECOND CAUSE OF ACTION**
**(NEGLIGENCE against ALL DEFENDANTS)**

85.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

86.     Defendants also owed Plaintiff a duty of care to invest and manage the Advisory Account consistent with Plaintiff's conservative investment objective and risk tolerance, client

22

profile, desire to safeguard and preserve his investment funds and to avoid exposure to unnecessary, unwelcome and unwanted risks.

87.     As described herein, Defendants breached their duties to Plaintiff.

88.     As a direct and proximate cause of Defendants' breach of their duties to Plaintiff, Plaintiff incurred damages exceeding $1 million and in an amount to be demonstrated at trial.

**THIRD CAUSE OF ACTION**
**(VIOLATIONS OF SECTION 10(b) OF SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5 against ALL DEFENDANTS)**

89.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

90.     Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

91.     The SEC's implementing regulation, Rule 10b-5, further defines the scope of the statutory language, rendering it unlawful, in connection with the purchase or sale of any security, to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5.

92.     Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities in Plaintiff's Advisory Account, engaged in a scheme to defraud and made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and

with an intent to deceive, manipulate or defraud or with recklessness such that their conduct was highly unreasonable and an extreme departure from the standards of ordinary care.

93.     Defendants made material misrepresentations and omissions to Plaintiff in order to induce Plaintiff to entrust his investment funds to Defendants and to continue to allow Defendants to manage the Advisory Account, by (i) falsely representing their level of experience and background, (ii) falsely representing that Defendants were expert financial professionals, (iii) falsely representing that Defendants were superior risk managers, (iv) falsely representing that Defendants would manage the Advisory Account in a conservative manner, (v) falsely representing the quality of, and level of risk associated with, the investments, (vi) falsely representing the true nature of the risks presented by Defendants' excessive utilization of margin, and (vii) failing to disclose the true nature of the risks associated with Defendants' investment strategy.

94.     Moreover, throughout the course of the relationship, Defendants repeatedly misrepresented and omitted the substantial risks associated with their investment strategy and the corresponding utilization of excessive margin and the nature of the investments that were made for Plaintiff in the Advisory Account in order to defraud Plaintiff into continuing to allow Defendants to control and manage the Advisory Account for which Defendants were paid significant fees.

95.     Defendants acted with the intent to deceive, manipulate or defraud Plaintiff, or with recklessness such that their conduct was highly unreasonable and an extreme departure from the standards of ordinary care.

96.     There is a direct connection between the misrepresentations and omissions and the purchase or sale of securities in the Advisory Account.

97.     Plaintiff reasonably and justifiably relied upon Defendants' material misrepresentations and omissions which directly and proximately caused the economic loss to Plaintiff.

98.     There is a direct causal link between Defendants' misconduct and the economic harm suffered by Plaintiff as the subject of the fraudulent statements and omissions was the cause of the actual loss suffered by Plaintiff.

99.     As a direct and proximate cause of Defendants' fraud, Plaintiff incurred damages exceeding $1 million and in an amount to be demonstrated at trial.

### FOURTH CAUSE OF ACTION
### (VIOLATIONS OF SECTION 10(b) OF SECURTIES EXCHANGE ACT 1934 – UNSUITABILITY - against ALL DEFENDANTS)

100.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

101.     Defendants further owed Plaintiff a duty to provide only suitable investment advice.

102.     Defendants purchased and sold securities for Plaintiff that were patently unsuited to Plaintiff's conservative objective and needs.

103.     Defendants further managed the Advisory Account utilizing a high-risk investment strategy that was patently unsuited to the Plaintiff's conservative objective and needs.

104.     Defendants knew or reasonably believed that the securities purchased or sold were unsuited to Plaintiff's conservative objective and needs.

105.     Defendants knew or reasonably believed that their high-risk investment strategy was unsuited to Plaintiff's conservative objective and needs.

106.     Defendants nevertheless purchased the unsuitable securities in the Advisory Account and managed the Advisory Account with an unsuitable, high-risk investment strategy anyway.

107.     Defendants made material misrepresentations, and owing a duty to Plaintiff failed to disclose material information, relating to the suitability of the securities and the high-risk, margin-based investment strategy utilized by Defendants for the Advisory Account.

108.     As described, Defendants repeatedly misrepresented the risks associated with their strategy and the investments that were made for Plaintiff in the Advisory Account in order to defraud Plaintiff into continuing to allow Defendants to control and manage the Advisory Account for which Defendants were paid significant fees.

109.     In addition, Defendants engaged in an investment strategy, and purchased and sold securities in the Advisory Account, knowing that such trading, utilization of excessive margin and investment strategy and the securities that they purchased and sold in the Advisory Account were unsuited for Plaintiff's needs and thoroughly inconsistent with Plaintiff's conservative investment objective and risk tolerance.

110.     Defendants acted with the intent to deceive, manipulate or defraud Plaintiff, or with recklessness such that their conduct was highly unreasonable and an extreme departure from the standards of ordinary care.

111.     Plaintiff justifiably relied to his detriment on the Defendants' material misrepresentations and omissions and fraudulent conduct.

112.     As a direct and proximate result of Defendants' material misrepresentations and omissions and unsuitable transactions, Plaintiff incurred damages exceeding $1 million and in an amount to be demonstrated at trial.

## FIFTH CAUSE OF ACTION
### (COMMON LAW FRAUD against ALL DEFENDANTS)

113.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

114.   As described herein, Defendants made materially false or misleading statements, and material omissions, in connection with the purchase and sale of securities in Plaintiff's Advisory Account.

115.   Defendants knew of, believed, or willfully ignored the falsity of these false and misleading statements and material omissions.

116.   Defendants thereby intended to induce Plaintiff to invest his assets with Defendants and to allow Defendants to have control over Plaintiff's discretionary Advisory Account.

117.   Defendants repeatedly and consistently misrepresented the level of risk of their strategy and investments.

118.   Plaintiff reasonably relied on Defendants' material misrepresentations and omissions in opening and maintaining his account with Defendants and establishing and continuing a relationship with Defendants.

119.   As a direct and proximate result of Defendants' fraud, Plaintiff incurred damages exceeding $1 million and in an amount to be demonstrated at trial.

## SIXTH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION against ALL DEFENDANTS)

120.   Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

121.   Defendants had a duty, as a result of a special and fiduciary relationship, to give correct information to Plaintiff.

122.   As described herein, Defendants made false representations that Defendants should have known were incorrect.

123.   The information supplied in the false representations was known by the Defendants to be desired by the Plaintiff for a serious purpose.

124.   Plaintiff intended to rely and act upon the false representations.

125.    Plaintiff reasonably relied on the false representations to his detriment.

126.    As a direct and proximate result of Defendants' false representations, Plaintiff incurred damages exceeding $1 million and in an amount to be demonstrated at trial

### SEVENTH CAUSE OF ACTION
### (NEGLIGENT SUPERVISION against DIA)

127.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

128.    DIA, a registered investment advisor, had a continuing legal duty to supervise Aizenberg, the ongoing and continuing management of the discretionary Advisory Account and the activity in the Advisory Account.

129.    DIA knew, or should have known, of Aizenberg's propensity for the wrongful and tortious conduct set forth herein.

130.    DIA's negligent supervision of Aizenberg proximately and foreseeably caused the injuries to Plaintiff.

131.    Based on the above referenced acts, omissions and misconduct, it is clear that DIA negligently supervised Aizenberg, causing Plaintiff to incur damages exceeding $1 million and in an amount to be demonstrated at trial.

### EIGHTH CAUSE OF ACTION
### (VIOLATION OF SECTION 20(a) OF SECURITIES EXCHANGE ACT
### OF 1934 against DIA)

132.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

133.    Section 20(a) of the Securities Exchange Act of 1934 provides, in pertinent part, that, with limited exception, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."  15 U.S.C. § 78t(a).

134.   As set forth above, Plaintiff has properly alleged that Aizenberg is liable to Plaintiff for violating Section 10(b) of the Securities Exchange Act of 1934.

135.   At all relevant times, DIA, a registered investment advisor, exercised power and control over Aizenberg, including by directing and causing the direction of the management and policies governing Aizenberg's activities, and by directing and culpably participating in the acts constituting the violations.

136.   By reason of the foregoing, DIA is liable to Plaintiff as a control person under Section 20(a) of the Securities Exchange Act of 1934 for Aizenberg's violations of Section 10(b) of the Securities Exchange Act of 1934.

*   *   *

**RELIEF REQUESTED**

     **WHEREFORE**, Plaintiff seeks a Judgement against Defendants, jointly and severally, for compensatory damages in excess of $1 million and in an amount to be determined at trial, consequential damages, punitive damages, pre-and post-judgement interest at the highest rate allowable by law, the costs, expenses and reasonable attorneys' fees incurred and associated with this matter, well-managed account damages and such other and further relief in Plaintiff's favor which this Court deems just, equitable, and proper.

**JURY TRIAL DEMANDED**

     Plaintiff hereby demands a trial by jury.

Dated: Mineola, New York
      July 28, 2020

                          Respectfully submitted,

             **WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

                          By: /s/ Irwin Weltz
                              Irwin Weltz
                              Thomas Scot Wolinetz
                              Robert B. Volynsky
                        170 Old Country Road, Suite 310
                        Mineola, New York 11501
                        Tel. (516) 506-0561
                        irwin@weltz.law

                        Attorneys for Plaintiff
                        *Richard E. Gordon*